1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DOUGLAS BISHOP, et al.,<br><br>                    Plaintiff(s),<br><br>      v.<br><br>CITY OF BUCKLEY, et al.,<br><br>                    Defendant(s). | CASE NO. C22-5759-KKE<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT |

This matter comes before the Court on a motion for partial summary judgment filed by Defendants City of Buckley ("City"), Arthur Fetter, and Kurt Alfano. Dkt. No. 30. The Court has considered the parties' briefing, the balance of the record, and the oral argument of counsel. As explained in this order, the motion is granted in part and denied in part.

## I.   BACKGROUND

This case arises from the death of Quincy Bishop during an interaction with police officers on November 1, 2020. The facts leading up to the interaction are largely undisputed, but the facts of the interaction itself are disputed. Thus, this section first addresses the background facts (noting disputes where relevant), then summarizes the factual disputes as to the interaction, and then sets forth the procedural posture of Defendants' motion in this lawsuit.

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

A.      **Background Facts**

On November 1, 2020, Quincy Bishop[1] went to the home of Jaida Coffin, his ex-girlfriend and mother of his two children.  Coffin's current boyfriend, Cody Wallace, was at Coffin's home when Quincy arrived.  *See* Dkt. No. 31-1 at 8.  After Quincy entered the home, Coffin told Quincy to leave, but Quincy grabbed Wallace by the sweatshirt and wrestled him onto a couch.  *Id*.  Coffin tried to break up the fight and Quincy elbowed her in the face, so she punched Quincy in the face.  *Id*.  Quincy then let go of Wallace, and Wallace left the house to call the police.  *Id*.

Quincy then found a blowtorch attached to a propane tank and told Coffin he would light the house on fire with her and their children inside.  Dkt. No. 31-1 at 8.  Coffin wrestled the blowtorch and tank away from Quincy, and Quincy grabbed a 12-inch serrated knife from the kitchen and held it to Coffin's throat, threatening to kill her.  *Id*.  Coffin tried grab the knife from Quincy, but Quincy moved the knife and cut Coffin's hand between her fingers.  *Id*.  Quincy then grabbed Coffin's cell phone from her sweatshirt, left the house, and drove away.  *Id*.  When Coffin called her cell phone to demand its return, Quincy answered and told her that he planned to shoot Wallace and burn down her house with her and their children inside.  *Id*.

A City police officer, Jack Frazier, responded to Wallace's call and interviewed Coffin at her home.  Dkt. No. 31-1.  Frazier ran a check on Quincy and discovered that there was a no-contact order in place between Coffin and Quincy, and that Quincy had an outstanding warrant for his arrest.  *Id*. at 8.  Coffin told Frazier that Quincy lived with his brother, Cory Bishop, but that she did not know Cory's address.  *Id*.

Later that night, when Fetter, a City police officer, arrived at the police station to begin his shift, a sergeant asked Fetter if he knew Quincy and Cory.  Dkt. No. 31-5 at 2.  Fetter told the

---

[1] Because several people relevant to this lawsuit have the same last name (Bishop), those people will be referred to by their first names after the first reference.

sergeant that he had known them both since high school and had been to Cory's house many times. *Id*. Fetter also told the sergeant that he had been contacted by Cory about a month earlier, and that Cory told Fetter that Quincy had been threatening Coffin and that Quincy was possibly armed and had made comments about committing suicide by cop or shooting a police officer. *See id*., Dkt. No. 31-18 at 2.

The sergeant told Fetter that Quincy had assaulted Coffin that morning, and that there was probable cause to arrest him. Dkt. No. 31-5 at 2. Fetter reviewed Frazier's report from that morning and confirmed that there was probable cause to arrest Quincy for second-degree felony assault, felony harassment, and second-degree theft of the phone. *Id*. The sergeant asked Fetter to bring Quincy in for questioning, and Fetter agreed to do so, believing that his familiarity with Quincy would make a confrontation less likely. *Id*.

Fetter then sent a text message to Cory, asking him to call. Dkt. No. 31-5 at 2, Dkt. No. 31-6 at 2. Cory called a few minutes later, and Fetter told Cory he wanted to talk to Quincy about the incident with Coffin earlier that day. Dkt. No. 31-5 at 2. Cory told Fetter that Quincy was not at his house at that time, but that he would reach out to Quincy to see where he was. *Id*. at 2–3. Fetter also asked Cory about Quincy's mental health, and Cory reported that Quincy was still struggling. *Id*.

While Fetter waited for more information on Quincy's whereabouts, he requested backup from other officers and proceeded to a nearby grocery store parking lot to meet them. Dkt. No. 31-5 at 3. While Fetter waited in the parking lot, Cory called to inform Fetter that Quincy was at Cory's house. *Id*. According to Fetter, he told Cory that he was waiting for another officer to arrive and that he would be there shortly. *Id*. According to Cory, Fetter told Cory he would be there soon, possibly with another officer but that he preferred to come alone "as a friend." Dkt. No. 38-1 at 5.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Three other officers then arrived at the parking lot where Fetter was waiting: Barclay Tuell, a City of Puyallup police officer; Bryan Ashmore, a Pierce County Sheriff's deputy; and Travis Calderwood, a Pierce County Sheriff's deputy. Dkt. No. 31-5 at 3. Fetter described the situation to them and told them of his past interactions with Quincy and Cory. *Id.*, Dkt. No. 31-14 at 3, Dkt. No. 31-15 at 3. He told them that he planned to talk to Quincy at Cory's house and that there was probable cause to arrest Quincy. The four officers then drove to Cory's house in their patrol vehicles. Dkt. No. 31-5 at 3.

When they arrived at Cory's house, Fetter saw Cory and Quincy inside the house looking out the window. Dkt. No. 31-5 at 3. By the time Fetter exited his car, he could see Quincy outside the house, walking toward the roadway. *Id.* Fetter told Quincy that he needed to talk with him, and Quincy continued walking toward his truck, which was parked on the shoulder of the road in front of Cory's house, saying that he needed to retrieve his wallet. *Id.* Quincy reached the truck and opened the driver's side door. *Id.* Fetter told Quincy that he had heard about the knife fight with Coffin earlier in the day, and asked whether his hands were injured and needed medical attention. *Id.* Quincy did not respond, and Fetter asked to see his hands. *Id.* Quincy put his hands out briefly and then sat down in the driver's seat of his truck and leaned over to open the glove box. *Id.* at 3–4. Quincy rummaged in the glove box, but did not remove any item from it. Dkt. No. 38-1 at 18.

Quincy then asked Fetter why he was there. Dkt. No. 31-5 at 4. Fetter told Quincy that he needed Quincy to come with him to the police station to make a statement about the incident with Coffin earlier in the day. *Id.* Quincy declined, stating that he did not think a statement was necessary and asked if he had to come with Fetter. *Id.* Fetter told him that he would like Quincy to come voluntarily. *Id.* Quincy stated that he could not come because he had to work. *Id.* Fetter then stated that he had to come with him to the station, and Quincy responded with something to

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 4

1  the effect of, "What if I don't?"  *Id*.  Fetter again ordered him out of the truck, and Quincy did not

2  comply.  *Id*.

3        Fetter then grabbed Quincy's left arm in an attempt to remove him from the truck.  Dkt.

4  No. 31-5 at 4.  Quincy attempted to start the truck, but Fetter reached across Quincy to grab the

5  keys out of the ignition.  *Id*.  Fetter again unsuccessfully attempted to pull Quincy from the vehicle.

6  *Id*.

7        There are factual disputes about what happened next, as set forth in the next section.

8  **B.    Defendants' Account of the Officers' Interaction with Quincy**

9        According to Defendants, while Fetter again tried to pull[2] Quincy from his truck, Tuell

10 grabbed Quincy's right shoulder/clothing with both hands and tried to pull him out of the truck.

11 *See* Dkt. No. 38-2 at 20.[3]  Quincy then moved one of his hands toward his waist and Fetter saw a

12 semi-automatic handgun tucked in the waistband of his pants.[4]  Dkt. No. 31-5 at 4.  Quincy reached

13 for the gun with his right hand and grabbed its grip.  *Id*.  Fetter yelled "Gun!" to the other officers

14 to warn them that Quincy had a gun, and then Fetter placed his left hand into the truck, pressing it

15 against Quincy's right hand on the gun, to stop him from drawing it.  *Id*.  Fetter used his right hand

16 to draw his own pistol and pressed it against Quincy's left cheek, in an attempt to convince Quincy

17 to stop resisting and to abandon his efforts to get his gun.  *Id*.  Fetter told Quincy to stop struggling,

18 but Quincy did not respond or comply.  *Id*.

19

20

21 [2] Tuell reported that at this point, Fetter told Quincy he was under arrest.  *See* Dkt. No. 38-2 at 20.  Fetter himself
22 testified that he never told Quincy he was under arrest, however.  *See* Dkt. No. 31-18 at 4.

   [3] According to Tuell, Quincy had both hands on the steering wheel at this time.  *See* Dkt. No. 38-2 at 20.

23 [4] Tuell stated that Quincy took his right hand off the steering wheel and moved it toward his waist (Dkt. No. 38-2 at
24 20), and Fetter stated that Quincy used his left hand to lift his sweatshirt, which revealed the gun (Dkt. No. 31-5 at 4).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Fetter realized that he could not continue to hold Quincy's hand in place and prevent him from getting his gun, so he fired one round into Quincy's cheek.  Dkt. No. 31-5 at 4.  Calderwood then shot Quincy in the back of the neck, and Tuell shot Quincy in the upper back.[5]  Dkt. No. 31-21 at 10.  Tuell called for medical aid and informed dispatch that shots had been fired.  Dkt. No. 31-14 at 4.

After the shots were fired, Cory began yelling at Fetter, accusing him of lying and killing his brother.  Dkt. No. 31-15 at 2.  Tuell and Calderwood approached Cory to try to comfort him and calm him down, and asked him to sit in the back of Tuell's City of Puyallup patrol vehicle.  Dkt. No. 31-13 at 2, Dkt. No. 31-15 at 2–3.

Before removing Quincy from the vehicle or rendering medical aid, Ashmore used his department-issued cellular phone to take photographs of the gun in Quincy's waistband, while Quincy was seated in the truck and Fetter lifted his sweatshirt.[6]  Dkt. No. 31-16 at 3.  Ashmore testified in a deposition that he believed this documentation was appropriate under the circumstances, but acknowledged he had not been instructed or trained to take photographs after a shooting.  *See id*.  Fetter then removed the gun from Quincy's waistband, removed the ammunition in it, and placed it in the back of the truck.  Dkt. No. 31-5 at 5.  The officers removed Quincy from the truck and laid him on the ground.  Dkt. No. 31-5 at 5, Dkt. No. 31-16 at 3.  The officers then began administering CPR and bandaging Quincy's gunshot wounds.  *Id*.  Quincy was pronounced dead at the scene.  Dkt. No. 31-8 at 5.

---

[5] Tuell's written statement completed after the shooting states that he shot Quincy because he feared for his life.  Dkt. No. 38-2 at 20.  He also stated in January 2021 that he did not realize that the other officers had shot Quincy until after the incident was over.  *Id*. at 21.

[6] The photographs were taken at 9:13 p.m., which is apparently three minutes after the "shots fired" call.  Dkt. No. 31-7 at 36, Dkt. No. 47 at 68.

1

2          Cory spent a number of hours in the back of the Puyallup police car and was later

3   transported for questioning at the Tacoma Police Department in a Tacoma squad car with two other

    officers.  *See* Dkt. No. 31-20 at 3.

4          The Pierce County Medical Examiner performed a postmortem examination the next day,

5   concluding that Quincy was killed by the shot to his neck, fired by Calderwood.  *See* Dkt. No. 31-

6   8 at 8, Dkt. No. 31-21 at 10.  The City's Use of Force Review Board ("Review Board") found that

7   Fetter's use of force complied with department policy and procedure.  Dkt. No. 31-10.  City Police

8   Chief Alfano concurred with this finding.  Dkt. No. 31-11.  The Pierce County Prosecutor's Office

9   also reviewed the incident, and found that the force used by Fetter, Tuell, and Calderwood was

10  lawful under the circumstances.  Dkt. No. 31-12.

11  **C.    Plaintiffs' Account of the Officers' Interaction with Quincy**

12         According to Cory, when Quincy walked out of the house to talk with Fetter initially,

13  Quincy did not have a gun concealed in his pants.  Dkt. No. 39 ¶ 7.  Quincy asked Fetter multiple

14  times if he was under arrest, and each time Fetter confirmed that he was not under arrest.  Dkt. No.

15  38-1 at 6–8, Dkt. No. 39 ¶ 4.  When Quincy refused to comply with Fetter's commands to exit the

16  truck and come to the police station willingly, Fetter said something like, "[Y]ou can either go the

17  easy way or the hard way."  Dkt. No. 39 ¶ 12.  Fetter then reached into the truck's cab and grabbed

18  Quincy's chest and shoulder to pull him out of the truck, while Quincy had both hands on the

19  steering wheel and one leg out of the truck.  Dkt. No. 38-1 at 8, Dkt. No. 38-2 at 20, Dkt. No. 39

20  ¶ 12.  Tuell then joined Fetter in attempting to wrestle Quincy out of his truck.  Dkt. No. 38-2 at

21  20.  Fetter then pulled out his gun and pressed it to Quincy's head, yelled "Gun!" and pulled the

22  trigger.  Dkt. No. 39 ¶ 13.  The other officers then fired their weapons because Fetter had fired his.

23  *Id*.  The shots were fired two minutes after the officers had arrived at Cory's home.  *See* Dkt. No.

24  31-9 at 10.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 7

When Cory realized that Quincy had been shot, he feared for his life and fell to his knees, putting his hands over his head.  Dkt. No. 31-20 at 3.  Two officers then grabbed him and forced him into a Puyallup Police Department vehicle.  *Id*.  Cory was locked in the back seat for nearly four hours.  *Id*.  Cory stated in a declaration that the officers placed a gun that had been somewhere in Quincy's truck (likely on the floorboard) in the waistband of Quincy's pants after he had been shot.[7]  Dkt. No. 39 ¶¶ 7, 14–15.

**D.    Procedural History**

This lawsuit was filed against Fetter, the City, and Alfano in October 2022 by Plaintiff Douglas Bishop, Quincy's father and the personal representative of his estate; Plaintiff Victoria Bishop, Quincy's stepmother[8]; Plaintiffs B.G.B. and M.D.B., Quincy's children[9]; and Cory and his wife, Kiara Bishop.  Dkt. No. 1.  Defendants moved for partial summary judgment (Dkt. No. 30), and this motion is now ripe for consideration.

## II.    ANALYSIS

**A.    Legal Standards on Summary Judgment**

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims[,]" so that "factually insufficient claims or defenses [can] be

---

[7] Fetter is the only officer who says that he saw Quincy's gun before shots were fired.  *See, e.g.*, Dkt. No. 31-15 at 2 (Calderwood's testimony that he did not see the gun or see Quincy reach toward his waist), Dkt. No. 31-16 at 2 (Ashmore's testimony that he saw Fetter and Quincy struggling in the truck with their hands near Quincy's waist), Dkt. No. 38-3 at 4 (Tuell's testimony that he did not see Quincy with a gun until after the shooting).  Tuell testified that he saw Quincy move his right hand toward his waist during the struggle, however.  Dkt. No. 31-13 at 2.

[8] The complaint identifies Victoria as Quincy's mother (Dkt. No. 1 ¶ 6), yet Cory testified in a deposition that Quincy's mother is deceased.  *See* Dkt. No. 38-1 at 3.  It appears that Victoria is married to Quincy's father, and is therefore Quincy's stepmother.

[9] Quincy's children are referred to by their initials because they are minors, and Douglas represents them here.  *See* Dkt. No. 1 ¶¶ 7, 11.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 8

1  isolated and prevented from going to trial with the attendant unwarranted consumption of public

2  and private resources." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 327 (1986).  In resolving

3  a motion for summary judgment, the court considers "the threshold inquiry of determining whether

4  there is the need for a trial—whether, in other words, there are any genuine factual issues that

5  properly can be resolved only by a finder of fact because they may reasonably be resolved in favor

6  of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "[T]here is no issue

7  for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a

8  verdict for that party." *Id*. at 249.

9   **B.  Disputes of Material Fact Prevent the Court From Granting Defendants' Motion for
10  Summary Judgment on Some of the Constitutional Claims and Preclude a Finding
    of Qualified Immunity.**

11  Plaintiffs' complaint asserts that Fetter violated Quincy's rights under the Fourth

12  Amendment.  *See* Dkt. No. 1 ¶¶ 34–37.  The complaint also alleges that Quincy's family members

13  were deprived of their Fourteenth Amendment right to enjoy Quincy's companionship and society

14  as a result of Fetter's conduct.  *Id*. ¶ 35.

15  Individuals may file civil actions against police officers for violating their constitutional

16  rights.  *See* 42 U.S.C. § 1983 (indicating that "[e]very person" acting under the color of state law

17  who deprives a person of a statutory or constitutional right "shall be liable to the party injured in

18  an action at law, suit in equity, or other proper proceeding for redress …").  Municipalities may

19  constitute a "person" for purposes of Section 1983 liability when "action pursuant to official

20  municipal policy of some nature caused a constitutional tort."  *See Monell v. Dep't of Soc. Serv. of

21  N.Y.*, 436 U.S. 658, 691 (1978).

22   1.  Fourth Amendment Claims and Qualified Immunity

23  "*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in

24  the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed

under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (cleaned up).

In their motion, Defendants argue that Fetter's conduct was reasonable under the circumstances and therefore did not violate the Fourth Amendment, or that in the alternative he is entitled to qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Defendants are entitled to qualified immunity "as a matter of law if, taking the facts in the light most favorable to [the plaintiff], they violated no clearly established constitutional right. The court must deny the motion for judgment as a matter of law if reasonable jurors could believe that [d]efendants violated [the plaintiff's] constitutional right, and the right at issue was clearly established." *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008).

Plaintiffs' opposition argues that disputed issues of material fact preclude summary judgment on the merits of Plaintiffs' constitutional claims, and likewise preclude a finding that Fetter is entitled to qualified immunity. Dkt. No. 37. At oral argument, however, Defendants conceded that, in light of the Court's ruling denying Defendants' motion to strike evidence relied on in Plaintiffs' opposition (Dkt. No. 58), the Court cannot grant Defendants' motion for summary judgment on the Fourth Amendment claims against Fetter or find that Fetter is entitled to qualified immunity. Thus, the Court turns to consider the other arguments raised in Defendants' motion for partial summary judgment.

2.  Fourteenth Amendment Claims

"Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013).  In order to prevail on such a claim when, as in this case, a "law enforcement officer makes a snap judgment because of an escalating situation" to use deadly force, a parent or child of the decedent must show that the officer's conduct "shocks the conscience" with "a purpose to harm without regard to legitimate law enforcement objectives."  *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (applying this standard to a parent of a decedent); *see also Waid v. Cnty. of Lyon*, 87 F.4th 383, 392 (9th Cir. 2023) (applying this standard to children of a decedent).  Defendants contend that because Fetter's conduct does not shock the conscience and was not carried out with a purpose to harm, he is entitled to summary judgment on Plaintiffs' Fourteenth Amendment claims.  Dkt. No. 44 at 9.

But if Plaintiffs' version of facts is believed, as it must be in resolving a motion for summary judgment, and Fetter shot Quincy in the absence of any threatening behavior on his part, and then conspired with other officers to plant a gun in Quincy's waistband to justify his use of deadly force, a reasonable jury could find that this conduct shocks the conscience and that Fetter used deadly force against Quincy with a purpose to harm without regard to legitimate law enforcement objectives.  Thus, the Court finds that disputed issues of fact preclude summary judgment on the Fourteenth Amendment claims of some of the Plaintiffs.  *See, e.g.*, *Atienza v. Hall*, No. 19-cv-03440-RS, 2021 WL 3409254, at *5 (N.D. Cal. Aug. 4, 2021) ("In a case like this one where the record is hotly disputed, an officer cannot combat the accusation that he acted without a legitimate law enforcement purpose by merely stating the contrary.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Specifically, Douglas and Quincy's children may present their Fourteenth Amendment claims to a jury, but neither Victoria nor Cory has shown that they—as neither a parent nor child of Quincy's—had the type of intimate family relationship with Quincy that the Constitution protects. *See, e.g.*, *Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1991) ("Neither the legislative history nor Supreme Court precedent supports an interest for siblings consonant with that recognized for parents and children."); *Mann v. City of Sacramento*, 748 F. App'x 112, 114–15 (9th Cir. 2018) (finding that siblings of a decedent had not "pleaded sufficient facts to show that any of them shared an 'intimate association' right protected under the First or Fourteenth Amendments").

While Plaintiffs do not oppose the dismissal of Cory's Fourteenth Amendment claim, at oral argument, Plaintiffs cited one unpublished case to support their argument that Victoria, as a stepparent, possesses an interest protected by the Fourteenth Amendment. *See Estate of Elkins v. Pelayo*, No. 1:13-CV-1483 AWI SAB, 2022 WL 1123117, at *23–24 (E.D. Cal. Apr. 14, 2022) (explaining that "depending on the nature of the relationship with the step-child and the level of involvement in the step-child's life, a step-child can have standing to bring a Fourteenth Amendment familial relationship claim"). However, Plaintiffs also conceded at oral argument that there is no evidence in the record as to the nature of Quincy's relationship with his stepmother.

Without evidence before the Court to suggest that Victoria's relationship with Quincy was akin to a parent-child relationship, the Court will grant Defendants' motion as to Victoria's Fourteenth Amendment claim. *Cf. Ramirez v. City of Oxnard*, No. 2:12-cv-09697-SVW-FFM, 2013 WL 12129396, at *7 (C.D. Cal. Jul. 23, 2013) (finding that because undisputed evidence shows that a foster parent had a "deeply interdependent and lengthy relationship" with decedent, the foster parent had standing to assert a Fourteenth Amendment claim).

In sum, to the extent that Cory and Victoria seek to bring Fourteenth Amendment claims

based on the deprivation of their familial relationship with Quincy, those claims are dismissed, but the Fourteenth Amendment claims raised by Douglas, on his own behalf and on behalf of B.G.B. and M.D.B., survive Defendants' motion.

**C.      Defendants are Entitled to Summary Judgment on Plaintiffs' Constitutional Claims Against the City of Buckley.**

As noted *supra*, a municipality can be liable under Section 1983 "when implementation of its official policies or established customs inflicts the constitutional injury." *Monell*, 436 U.S. at 708 (Powell, J., concurring).  There are three pathways to municipal liability under Section 1983: (1) the municipality's official policies or customs inflict the constitutional injury, (2) the municipality's omissions or failures to act suggest an unofficial policy of deliberate indifference to the constitutional rights of others, or (3) a municipal policy-maker ratifies a subordinate's unconstitutional conduct.  *See Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc).

Defendants argue that although there may be questions of fact that preclude summary judgment on Plaintiffs' constitutional claims against Fetter, no evidence supports municipal liability for Fetter's actions.  Dkt. No. 30 at 22.  According to Defendants, there is no evidence that a City policy or custom caused any constitutional violations, that the City was deliberately indifferent to any constitutional rights, or that the City ratified any unconstitutional act.  *Id*. at 19–24.

Plaintiffs contend that they rely on sufficient evidence of City policy or custom that gives rise to *Monell* liability in three ways: (1) the City failed to conduct the internal administrative review of the shooting required by City policy and yet ratified Fetter's unconstitutional use of force; (2) the City failed to track its officers' improper uses of force as required by City policy and

other generally accepted police practices, and Fetter and other City officers failed to comply with City policies addressing how to deal with a person experiencing a mental health crisis and use of deadly force; and (3) the City failed to enact policies that would have prevented Quincy's death. Dkt. No. 37 at 25–26.  For the following reasons, the Court finds that Plaintiffs have not put forward sufficient evidence to withstand Defendants' motion for summary judgment on the *Monell* claim.

      1.  <u>Ratification</u>

If a municipal decisionmaker makes a "conscious, affirmative choice" to approve a subordinate's unconstitutional act and the basis for it, that ratification may give rise to municipal liability for the subordinate's unconstitutional act.  *See Gillette v. Delmore*, 979 F.2d 1342, 1347–48 (9th Cir. 1992), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc).

In this case, the City found that Fetter's use of force complied with City policy, and Plaintiffs characterize this finding as a ratification of Fetter's unconstitutional conduct.  *See* Dkt. No. 37 at 25–26.  Plaintiffs also emphasize that in conducting its review, the City relied on the reports of other offices, including the Pierce County Prosecutor's Office, rather than conducting its own independent investigation of Fetter's use of force to determine whether Fetter's actions complied with City policy.  *Id*.  According to Plaintiffs, this failure to conduct an independent internal investigation violates Buckley Police Department Policy 305 and supports a finding that the City ratified Fetter's conduct, because it approved his actions without sufficient scrutiny.  *See* Dkt. No. 40-1 at 23–24.

At oral argument, Defendants conceded that the City did not conduct an independent internal review of Fetter's use of force, but argued that this failure did not encourage unconstitutional action, given that the review that was performed was thorough and allowed the

City to determine whether Fetter's use of force complied with City policy.  Indeed, the City's Use of Force Review Board July 2021 decision references a presentation made by a Tacoma Police Department detective and the board's own review of City policies and training.  *See* Dkt. No. 31-10.  The City's police chief, Alfano, affirmed the findings of the Review Board that same month. Dkt. No. 31-11.  The Pierce County Prosecutor's Office issued a report in December 2021 finding that the three officers who shot Quincy (Fetter, Tuell, and Calderwood) used force lawfully.  *See* Dkt. No. 31-12.  Plaintiffs have not shown that any of the investigations performed were deficient. Although Plaintiffs emphasized at oral argument that the City and the Review Board relied on Fetter's statements about the shooting and did not interview him, Plaintiffs have not shown that City policy required or should have required an interview.

Moreover, the City's finding that Fetter's use of force was consistent with City policy (or even its apparent decision to reward Fetter for his handling of this use of force (Dkt. No. 38-1 at 19)) does not amount to a ratification suggesting that the City has a policy of promoting constitutional violations, because no constitutional violation was obvious in the record before the Review Board.  The record before the Review Board described Quincy's efforts to access a gun in his waistband when the officers used deadly force against him, and did not document any dispute about whether Quincy was armed during the encounter.  *See* Dkt. Nos. 31-7, 31-8, 31-9.  Indeed, there is no evidence that, at the time of the review, this dispute had materialized.  Although Plaintiffs suggested at oral argument that the reviewing bodies should have been suspicious of Fetter's account based on the timing of the photographs of the gun in Quincy's waistband or because Fetter was the only officer who reported seeing the gun in Quincy's waistband, Plaintiffs have not shown that the evidence before the Review Board "contained holes and inconsistencies that should have been visible to any reasonable police administrator."  *Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991) (finding municipal liability based on a ratification theory, where

evidence showed obviously deficient internal police investigations) (cleaned up).  The disputes of fact that preclude summary judgment on the excessive force claim were not presented to the Review Board, such that the Review Board was unreasonable in crediting the officers' statements for purposes of its review.  *See, e.g.*, *German v. Roberts*, No. C15-5237 BHS-DWC, 2017 WL 6547472, at *4 (W.D. Wash. Dec. 22, 2017) ("[E]ven if a jury ultimately disagrees with [the defendant's] version of the events, the Court cannot conclude that there is any evidence to show that the review board acted unreasonably in believing [the defendant's] description of the shooting.").

In light of the record as it existed before the Review Board and the City, the Review Board reasonably found, and the City reasonably affirmed, that Fetter's use of force was not excessive. *See Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1191 (D. Haw. 2003) ("The facts presented to the review board would not, by themselves, indicate to any reasonable administrator that the shooting was improper.").  Plaintiffs have cited no evidence suggesting that the City's affirmation of a finding approving of Fetter's use of force constitutes a ratification that would give rise to *Monell* liability.  *See Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) ("[R]atification requires, among other things, knowledge of the alleged constitutional violation.").

2.  Officers' Failure to Follow Existing City Policies

Second, Plaintiffs argue that the City failed to follow its own policy requiring that the police chief, Alfano, review an annual report analyzing all uses of force in the police department.  Dkt. No. 37 at 26.  Alfano apparently admitted at his deposition that his department generally did not create the annual report because there are typically so few uses of force in Buckley that each use is reviewed individually.  *See* Dkt. No. 40-1 at 24.  Plaintiffs have not shown that the City's failure to assess uses of force on an annual, rather than individual, basis amounted to a policy or custom that encouraged or condoned the constitutional violation alleged here.  *See City of Canton v.*

1 *Harris*, 489 U.S. 378, 385 (1989) (holding that the "first inquiry in any case alleging municipal

2 liability under § 1983 is the question whether there is a direct causal link between a municipal

3 policy or custom and the alleged constitutional deprivation").

4        Plaintiffs also argue that Fetter and the sergeant who assigned him to this matter failed to

5 follow City policy as to interactions with those in mental health crises, and that their failure to

6 follow this policy "creat[ed] a dangerous situation which culminated in the shooting of Quincy

7 Bishop[.]"  Dkt. No. 37 at 26.  According to Plaintiffs' expert, the officers' plan to approach

8 Quincy did not comply with the procedures appropriate to a crisis intervention under City Policy

9 420.  *See* Dkt. No. 40-1 at 27.  Plaintiffs' expert also opined that the City should have also adopted

10 other model policies regarding how to respond to and de-escalate interactions involving those

11 experiencing a mental health crisis and use of deadly force in general.  *Id*. at 27–33.

12        Plaintiffs fail to explain how the officers' failure to follow an existing City policy and/or

13 failure to categorize this incident as a mental health crisis intervention—on this one occasion—

14 suggests that the City had an informal policy or custom of not following City Policy 420 or of

15 failing to train its officers as to this policy.  Moreover, municipal liability under Section 1983 is

16 predicated on a theory that a City policy or custom *caused* the constitutional violation, but

17 Plaintiffs' arguments suggest following City policy could have *prevented* the violation.  Evidence

18 of the officers' alleged failure to follow City policy this one time is not enough to establish

19 municipal liability for the constitutional violation alleged here.  *See, e.g.*, *Connick v. Thompson*,

20 563 U.S. 51, 68 (2011) ("[S]howing merely that additional training would have been helpful in

21 making difficult decisions does not establish municipal liability."); *Estate of Ostby v. Yellowstone*

22 *Cnty.*, CV 17-124-BLG-SPW-TJC, 2019 WL 960023, at *3 (D. Mont. Jan. 24, 2019) (holding that

23 *Monell* liability "cannot be based on the failure of an individual or individuals to follow an existing

24 policy[,]" but "must be predicated on a municipal policy that causes the constitutional violation").

Even "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *City of Canton*, 489 U.S. at 391.

For these reasons, the Court finds that Plaintiffs have not met their burden to show a triable issue of fact as to the City's *Monell* liability under the theory that Defendants failed to follow City policy.

### 3.  The City's Failure to Enact Certain Policies

Last, Plaintiffs argue that the City is liable under *Monell* because it failed to enact policies consistent with accepted policing standards as to de-escalation, mental health crisis interventions, or interactions with familiar community members.  *See* Dkt. No. 37 at 26–27.

In the absence of a showing that the City was "deliberately indifferent" to the constitutional rights of those its officers serve, however, Plaintiffs cannot establish municipal liability based on the City's failure to enact these policies.  Although Plaintiffs' expert opined that the City's policies were deficient as to certain topics, there is no evidence that the City consciously refused to enact those policies, or was on notice that such policies were needed, such that municipal liability for Fetter's conduct would follow.  *See Connick*, 563 U.S. at 62 ("Without notice that a source of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."); *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 682–83 (9th Cir. 2021) (explaining that a plaintiff asserting *Monell* liability based on a failure to enact a particular policy "must show that [the municipality] has actual or constructive knowledge that its practices were substantially certain to cause a constitutional violation").  Plaintiffs made no reference to any evidence of the City's actual or constructive knowledge that its policies were deficient (Dkt. No. 37 at 26–27), and therefore failed to meet their burden to show that there is a triable issue of fact as to *Monell* liability under this theory.

**D.    Plaintiffs Do Not Oppose Summary Judgment on Certain Claims.**

1.    Defendants are Entitled to Summary Judgment on Cory's Fourth Amendment Claim.

Plaintiffs' complaint alleges that Cory's Fourth Amendment rights were violated when he was unlawfully detained in the back of a police car after Quincy was shot.  Dkt. No. 1 ¶ 47. Defendants do not dispute that Cory was detained, but argue that because none of the Defendants in this action detained Cory, this claim must be dismissed.  Dkt. No. 30 at 18–19.

Plaintiffs do not oppose this part of Defendants' motion, and conceded at oral argument that this claim should be dismissed.

2.    Defendants are Entitled to Summary Judgment on Claims Against Alfano in His Individual Capacity.

The only allegation in the complaint that relates to Alfano refers to him as the police chief who "at all relevant times hereto, was acting under color of law."  Dkt. No. 1 ¶ 3.  Alfano has been the chief of police for the City of Buckley since December 2020, and was therefore not chief at the time Quincy was shot.  Defendants thus contend that any claims brought against Alfano in his individual capacity must be dismissed.  Dkt. No. 30 at 27.

Plaintiffs' opposition does not respond to this argument or otherwise address any claims brought against Alfano individually.  *See* Dkt. No. 37; Dkt. No. 44 at 10.  Because Plaintiffs failed to oppose dismissal of the claims against Alfano in his individual capacity, Defendants' motion is granted with respect to these claims.

3.    Defendants are Entitled to Summary Judgment on Victoria's State-Law Claim.

The complaint alleges that Victoria lost her son and suffered severe emotional distress as a result of Defendants' conduct described in the cause of action for state-law negligence.  *See* Dkt. No. 1 ¶¶ 50, 55–56.

Defendants note that Victoria is Quincy's stepmother, not biological mother, and she did

1    not adopt him.  Dkt. No. 30 at 26 (citing Dkt. No. 31-19).  Defendants argue that stepparents are

2    not entitled to recover damages arising from the wrongful death of their stepchildren, and therefore

3    Victoria "has no basis to claim any damages in this matter and she should be dismissed as a

4    plaintiff."  Dkt. No. 30 at 26.

5         Plaintiffs make no effort to oppose Defendants' motion challenging the viability of

6    Victoria's state-law claim for lack of standing, and that claim is therefore dismissed.  *See* Dkt. No.

7    30 at 26.

8         4.   Kiara's Constitutional Claims are Dismissed.

9         The complaint alleges that Kiara suffered severe emotional distress as a result of

10   Defendants' conduct that resulted in Quincy's death, as described in the causes of action for

11   constitutional violations and the state-law claims for negligence and negligent infliction of

12   emotional distress.  *See* Dkt. No. 1 ¶¶ 40, 45, 49, 55–56.  As to Kiara, Defendants argue that as

13   Cory's wife and Quincy's sister-in-law, Kiara "lacks standing to bring damages claim[s] arising

14   from Quincy's death."  Dkt. No. 30 at 26.  Defendants concede, however, that Kiara's claim for

15   negligent infliction of emotional distress survives their motion for partial summary judgment.  *Id*.[10]

16        In their opposition, Plaintiffs emphasize that Defendants concede that Kiara's negligent

17   infliction of emotional distress claim survives summary judgment (Dkt. No. 37 at 27), but they do

18   not present any argument opposing Defendants' request that Kiara's constitutional claims be

19   dismissed.  As it appears that Kiara does not have standing, as a matter of law, to assert a

20   constitutional claim arising from Quincy's death, Defendants' motion is granted as to these claims.

21

22

23

24

---

[10] To the extent that Defendants' reply brief suggests otherwise (Dkt. No. 44 at 10 (stating that "for the reasons set forth in Defendants' opening brief, neither Victoria nor Ki[a]ra have viable state law claims against any of the Defendants")), defense counsel disavowed the statement in the reply brief at oral argument.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

### III.   CONCLUSION

As explained herein, the Court GRANTS IN PART and DENIES IN PART Defendants'

motion (Dkt. No. 30).  The following claims are dismissed:

(1) Plaintiffs' constitutional claims against the City of Buckley,

(2) Cory Bishop's Fourth Amendment claim for unlawful seizure,

(3) All of Victoria Bishop's claims,

(4) Kiara Bishop's constitutional claims, and

(5) Plaintiffs' claims against Kurt Alfano in his individual capacity.

The clerk is therefore directed to TERMINATE Victoria Bishop as a Plaintiff and Kurt Alfano as

a Defendant.  Defendants' motion is denied in all other respects.

Dated this 19th day of April, 2024.

_____
Kymberly K. Evanson
United States District Judge

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 21